# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER 15-0058-02 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| KEVIN HONEYCUTT | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 49] filed by defendant, Kevin Honeycutt.  For reasons stated below, it is recommended that the motion be DENIED.

## Background

On October 8, 2014, agents with the Metro Narcotics Unit ("MNU") began monitoring Ouachita Correctional Center detainee, Vacarra Rogers' (a/k/a Vacarra Comanche) telephone conversations.  In so doing, agents heard Rogers arrange for Kendra Turner to travel to Dallas on October 9, 2014, to retrieve what they believed to be was controlled dangerous substances. Armed with this information, an agent applied for, and obtained, a warrant from a state court judge to place a GPS tracking device on Turner's vehicle.

The tracking device notified the agents as the vehicle left Monroe, Louisiana, and traveled to Dallas, Texas, arriving at approximately 2:30 a.m. on October 10, before quickly turning around to return to the Monroe area.  Accordingly, at 6:06 a.m, on October 10, 2014, an MNU agent applied for, and obtained a warrant to search Turner's vehicle for methamphetamine. MNU agents stopped Turner's vehicle as it exited I-20 in Monroe, Louisiana, and brought it to MNU headquarters where it was searched.  The search uncovered approximately one pound of

methamphetamine hidden in the tire well of the trunk.

Upon questioning by the agents, Kendra Turner agreed to place a controlled telephone call to Kevin Honeycutt – the person to whom she had intended to deliver her illicit cargo. Following the call, five or six MNU agents, including Special Agent Vic Zordan of the Drug Enforcement Agency ("DEA"), converged on Honeycutt's residence.  Honeycutt answered the door, and agreed to speak with the agents.  He acknowledged that Turner had left some methamphetamine with him, and led the agents to a bedroom where he revealed a mason jar containing approximately 100 grams of methamphetamine.  The agents placed Honeycutt under arrest and obtained his permission to search the remainder of the home.  The agents promptly found two firearms:  a Taurus revolver and a Lorcin pistol.  Honeycutt told the agents that the revolver was his, but that he was holding the pistol for his friend.

On March 26, 2015, a federal grand jury returned a five-count indictment against Kevin Honeycutt and three co-defendants, Vacarra Rogers, Kendra Turner, and Ruby McMillan.  Three of the five counts were directed against Honeycutt for possession of methamphetamine with intent to distribute, conspiracy to possess and distribute methamphetamine, and possession of firearms by a convicted felon, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846 and 18 U.S.C. § 922(g)(1).  *See* Indictment.

On June 30, 2015, Honeycutt, via counsel, filed the instant motion to suppress all evidence and statements obtained in violation of his constitutional rights.  Following delays for a September 1, 2015, hearing, the matter is now before the court.

## Relevant Testimony and Documentary Evidence

A single witness testified at the hearing – S.A. Vic Zordan.  In addition, the government introduced all twelve of the exhibits that the court accepted into evidence.

The court summarizes relevant testimony and evidence, as follows,

1.  On October 8, 2014, Ouachita Parish Sheriff Deputy Paul Knight received information
    concerning telephone calls originating from the Ouachita Correctional Center ("OCC")
    which were suggestive of activity involving controlled dangerous substances ("CDS").
    Specifically, the OCC inmate telephone system revealed that detainee, Vaccara Rogers,
    had called Kendra Turner, an associate of his, who, along with Rogers, had been arrested
    on August 2, 2014, but subsequently released.  During the first call, Rogers had Turner
    conference in Rogers' mother so he could attempt to persuade her (unsuccessfully) to take
    a child and accompany Turner on the trip because it would make a better "cover."  Thirty
    minutes later, Rogers again called Turner and had her conference in Rogers' "uncle."
    Rogers told his uncle to "have it on deck," because it would be an immediate turnaround.
    Rogers then had Turner conference in Kevin Honeycutt to whom he explained that
    everything was set.  Rogers did not identify any specific CDS by name, but sometimes
    referred to the items to be transported as "tires."

2.  Further monitoring of the telephone calls revealed that after she left work on October 9,
    2014, Turner intended to drive a 2003 Lexus GS 300 bearing Louisiana license plate
    number YOE 289 to 870 Valleybrook in Arlington, Texas, and to return on October 10.
    Records confirmed that the Lexus was registered to Kendra Turner.

3.  Armed with this information, Deputy Knight applied for a search warrant to place a
    global positioning system ("GPS") tracking device on the 2003 Lexus.  In his affidavit,
    Knight represented that agents had monitored jailhouse calls from Rogers to Turner in
    which Rogers directed Turner to transport "CDS" from Texas to Monroe.  Knight noted
    that Rogers had instructed Turner on how to avoid law enforcement detection.  Further
    conversations between the subjects indicated that Turner would depart the Monroe area
    when she left work around 10:00 p.m.  Citing his fourteen years of experience as a
    Ouachita Parish Sheriff's deputy, Knight opined that it was common for individuals
    involved in CDS distribution in Ouachita Parish to travel to parts of Texas to obtain the
    CDS.

4.  On October 9, 2014, at 4:55 p.m., the Honorable Daniel Ellender, 4th Judicial District
    Court Judge, for the Parish of Ouachita, State of Louisiana, signed a warrant authorizing
    the "search" of the 2003 Lexus GS 300 by seizing the "routes, direction of travel,
    information and current vehicle locations for a period not to exceed 30 calendar days."
    At 7:32 p.m., on October 9, 2014, MNU agents placed a tracking device on the Lexus,
    which permitted them to remotely monitor the car's movement.

5.  The device revealed that later in the evening on October 9, the Lexus entered Interstate 20
    apparently in Monroe, Louisiana, and proceeded westbound before exiting at 1:39 a.m. on
    October 10 in the Dallas area.  The car stopped at a location on Valleybrook Drive, and
    remained there for seven and one-half minutes before departing.  After stopping at a
    convenience store, the car re-entered I-20, eastbound.

3

6.     With this additional information, and after having heard Rogers tell Turner during one of the monitored calls that she should not consent to search the vehicle, Scotty Sadler[1] petitioned Judge Ellender on October 10, 2014, at 6:06 a.m. for a warrant to search Turner's vehicle.  In his supporting affidavit, Sadler recounted the facts from the previous affidavit used to obtain the tracking device warrant, but included the additional facts that the car had traveled to Dallas and stopped briefly at two locations before returning to Ouachita Parish.  Sadler averred that the vehicle had been stopped by MNU agents.  Judge Ellender issued a warrant to search the vehicle which was purportedly located at "I-20 **westbound** 118 milepost, West Monroe, LA 71291."

7.     MNU agents, however, actually stopped Turner's car when it exited I-20 eastbound at Jackson Street, Monroe, Louisiana.  According to the report prepared by Deputy Knight (Gov't Exh. 5) agents observed the vehicle on I-20 at 6:15 a.m., and followed it until it exited on Jackson Street.  Thus, if the times set forth in the search warrant and Deputy Knight's report are correct, then the agents obtained the search warrant shortly before the vehicle was stopped.

8.     MNU agents brought the vehicle and its sole occupant, Kendra Turner, to MNU headquarters where, at 7:05 a.m., a search of the vehicle's trunk uncovered a tupperware bowl wrapped in plastic containing 521 grams of methamphetamine.  MNU agents promptly placed Turner under arrest.

9.     S.A. Zordan read Turner her *Miranda* rights, before he and Deputy Knight questioned her.  Turner told the agents that Rogers had asked her to go to Arlington, Texas, to pick up "tires."  She was supposed to deliver these "tires" to Kevin Honeycutt.  S. A. Zordan testified at the hearing that "tires" was a commonly used code name used by drug traffickers for illegal or controlled substances.  Zordan and Knight eventually asked Turner if she would be willing to make a recorded telephone call to Honeycutt.  She agreed.  At 9:18 a.m., Turner called Honeycutt and told him that she intended to go to his residence.

10.    That afternoon, an MNU team comprised of five-six agents converged on Honeycutt's residence at 1713 Hollywood Drive, Monroe, Louisiana.  Although all of the team members were armed, no one had their weapons drawn.  S.A. Zordan, who was dressed in shorts, sneakers, a t-shirt, and a ballistics vest labeled "Police," knocked on the door.  Almost immediately, Kevin Honeycutt answered.  Zordan asked Honeycutt if he could speak with him, to which Honeycutt replied, "sure."  Thus, the agents stepped inside the house.

11.    Zordan explained to Honeycutt that there was a significant investigation going on

---

[1]  According to his affidavit, Sadler also was a fourteen year veteran with the Ouachita Parish Sheriff.

involving Kendra Turner, and that he believed that Honeycutt knew more than he was disclosing.  Honeycutt told the agents that Turner was supposed to bring him some money.  Zordan interjected at that point,[2] and, in an authoritative tone, advised Honeycutt of his *Miranda* rights.[3]  After reciting the warnings, Zordan confirmed with Honeycutt that he understood his rights.  At no time did Honeycutt tell the agents that he wished to consult a lawyer before speaking with them.  He also did not give the agents the impression that he was reluctant to talk with them without an attorney present.  To the contrary, Honeycutt was the epitome of cooperation.

12.     Zordan related to Honeycutt that he had listened to the telephone call between Turner and Honeycutt.  Zordan then asked Honeycutt whether he had anything illegal in the house.  Honeycutt replied that Turner had left some methamphetamine there.  Zordan asked Honeycutt if he minded whether the agents took possession of the contraband.  Honeycutt did not voice any objection and began to walk down the hall to retrieve it.  Because of the possibility that Honeycutt might be using this explanation as a ruse to arm himself with a weapon, Zordan quickly stated, "hold on a second, let's go together."  Honeycutt did not object to the officers' accompanying him.  Two other members of the team went with Zordan down the hall.

13.     Honeycutt led the agents into a bedroom that was used for storage.  Honeycutt moved some clothing and uncovered a mason jar containing approximately 100 grams of methamphetamine.  The agents secured the jar and escorted Honeycutt back to the living room where Zordan informed him that he was under arrest.  The agents did not handcuff Honeycutt, however.

14.     Zordan told Honeycutt that they needed to search the rest of the house, and asked if there was any other contraband present and whether he minded if the agents searched the house for any other stuff.  Honeycutt assured the agents that there was nothing else, and assented to the search.  As per his practice, Zordan did not obtain written consent to search.  Zordan remained with Honeycutt while several other agents searched the various rooms in the house.  Honeycutt did not restrict the scope of the search in any way.  Moreover, because of the small size of the house, Honeycutt was able to see much of the house from where he was located.

15.     The search quickly resulted in the discovery of two firearms:  a .357 revolver and a Lorcin handgun.  Honeycutt told Zordan that the revolver was his, but that he was holding the Lorcin for a friend of his.  The search also uncovered several re-sealable bags

---

[2]  Deputy Knight indicated in his report that Zordan advised Honeycutt of his *Miranda* rights "upon making contact" with him, and before any questions were asked.

[3]  Zordan stated that he did not provide Honeycutt with written *Miranda* warnings because it was not his practice to do so.

commonly used to package CDS, a digital scale, and $800 cash in small denominations.

16.     Zordan estimated that two minutes elapsed between the time that he advised Honeycutt of his *Miranda* rights, and when he placed Honeycutt under arrest.  The agents located the firearms within two minutes after that.  At no time did Honeycutt rescind his consent.

17.     Honeycutt remained jovial and cooperative throughout the encounter.  Zordan explained that when he would ask Honeycutt a question, Honeycutt would freely elaborate in his responses.  The officers never exerted any physical force on Honeycutt.  No force was necessary because Honeycutt never offered any physical or verbal resistance.

18.     Honeycutt later assisted the agents by participating in a recorded telephone call to Ruby McMillan.  A photograph depicts Honeycutt cooperatively showing S.A. Zordan his cellphone.  (Gov.'t Exh. 12).  Honeycutt told one of the agents that McMillan had paid $5,000 for six ounces of methamphetamine, which he was supposed to deliver to her in Sterlington, Louisiana.  Honeycutt said that he had done this twice before with McMillan.  Honeycutt further assisted the agents by participating in a controlled delivery of methamphetamine to Ruby McMillan.  Throughout the encounter, Honeycutt never stopped being cooperative, and never expressed any remorse concerning his prior cooperation.

## Law and Analysis

Honeycutt's motion seeks to suppress the two warrants issued by the state court judge

pertaining to Kendra Turner's vehicle, plus another warrant issued for her cell phone,[4] "due to

omissions and mistakes contained within the affidavits and oaths in support thereof . . ."  He

further alleges that he did not receive any *Miranda* warnings, and therefore, any statements

obtained from him should be suppressed.  Finally, he contends that he never consented to a

search of his home; thus, any evidence uncovered pursuant to that search must be suppressed.

---

[4]  The application and warrant for Turner's cellphone was not introduced into evidence at the hearing.  It was, however, attached as an exhibit to defendant's motion to suppress.  Nonetheless, MNU agents did not apply for, and obtain the cell phone warrant until October 15, 2014, – i.e. several days after they had obtained incriminating evidence and statements from Honeycutt.  Thus, any deficiencies in the cell phone warrant did not lead to the discovery of any non-cumulative evidence against Honeycutt.  In any event, as with Turner's car, *see* discussion *infra*, Honeycutt has failed to demonstrate a legitimate expectation of privacy in Turner's phone as required to support a Fourth Amendment challenge to its search.

The court will address the arguments, in turn.

## I.      The Car

### a)      Honeycutt Does Not Enjoy Standing to Contest the Search(es) and Seizure of Turner's Vehicle

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST., AMEND. IV.  The protections of the Fourth Amendment extend to the states via the Fourteenth Amendment.  *Dunaway v. New York*,  442 U.S. 200, 207, 99 S.Ct. 2248, 2253-2254 (1979) (citation omitted).  The courts deter Fourth Amendment violations by excluding evidence obtained as a result of the transgression.  *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted).

A key limitation to the foregoing principle, however, is that Fourth Amendment rights may not be vicariously asserted.  *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013), *cert. denied*, ___ U.S. ___,  134 S. Ct. 1326 (2014) (citing *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961 (1969).  That is to say, a "defendant seeking to suppress evidence under the Fourth Amendment must demonstrate that his or her individual rights were violated."  *Id*. (citing *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421 (1978)).  Toward that end, the defendant must show that he or she had a legitimate expectation of privacy in the area searched.  *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991) (citing *inter alia Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561 (1980)).  Defendant bears the burden of establishing standing.  *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (citation omitted).[5]  Standing is a

---

[5] Although the Supreme Court has merged the "standing" requirement into the substantive Fourth Amendment analysis itself, the Fifth Circuit continues to discuss the Fourth

question of law.  *Ibarra supra* (citation omitted).

In determining whether a defendant has a reasonable expectation of privacy sufficient to contest the validity of a search, the court inquires "(1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as reasonable."  *United States v. Finley*, 477 F.3d 250, 258-59 (5th Cir. 2007) (citations omitted). Relevant factors include,

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy[,] and whether he was legitimately on the premises.

*Id*.

In this case, defendant fails to satisfy either prong of the "reasonable expectation of privacy" requirement.

In his motion, Honeycutt did not set forth any basis to support a subjective expectation of privacy in Turner's vehicle.  In fact, he did not assert any possessory interest in the car *or* the drugs seized from the trunk of Turner's car.  In *Rakas*, the Supreme Court confirmed that a car passenger has no legitimate expectation of privacy in the car's glove compartment or trunk where the passenger did not assert a possessory interest in the car or in the property seized.  *Rakas*,  439 U.S. at 148-149, 99 S. Ct. 421 at 433.  Even if Honeycutt had a possessory interest in the drugs

---

Amendment's "personal" interest requirement in terms of standing*.  United States v. Maldonado*, 999 F.2d 1580, 1993 WL 307857, *3, n2 (5th Cir. 1993) (unpubl.).

found in the car,[6] he has not demonstrated any subjective expectation of privacy in Turner's car. *See Rawlings, supra* (although petitioner claimed ownership of drugs in third-party's purse, he failed to demonstrate subjective expectation of privacy in the purse itself); *see also United States v. Pierce*, 959 F.2d 1297, 1303 (5th Cir. 1992) (no standing where defendant never attempted to establish any privacy interest in the package); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988) (no standing where defendant failed to assert that he was part owner of the drugs in transit).

In an attempt to circumvent the Supreme Court's restrictive application of the exclusionary rule to transgressions of an individual's *own* Fourth Amendment rights, defendant urges the court to consider the Louisiana Constitution which expressly extends standing to "[a]ny person adversely affected" by an illegal search or seizure.  LA. CONST. ART. 1, § 5.  The various states, of course, enjoy the autonomy to impose higher standards on searches and seizures than that required by the Federal Constitution.  *Cooper v. State of Cal.*, 386 U.S. 58, 62, 87 S. Ct. 788, 791(1967).  However, the federal courts are not bound to apply these protections in a federal prosecution.  Rather, "[w]hether the Fourth Amendment has been violated is determined solely by looking to federal law on the subject." *United States v. Walker*, 960 F.2d 409, 415-16 (5th Cir. 1992); *United States v. Guerrero*, 500 F. App'x 263, 265 (5th Cir. 2012).  Similarly, federal law exclusively guides application of the exclusionary rule in federal court.  *United States v. Mahoney*, 712 F.2d 956, 959 (5th Cir. 1983).  Moreover, the Supreme Court has categorically rejected the argument that an individual expectation of privacy should be deemed reasonable as a

---

[6] At best, the evidence suggests that Honeycutt facilitated the exchange of drugs and money between Turner and McMillan.

matter of federal constitutional law merely because the underlying seizure was impermissible under state law.  *California v. Greenwood*, 486 U.S. 35, 43, 108 S. Ct. 1625, 1630 (1988); *see also United States v. Longoria*, 352 F. App'x 968, 969 (5th Cir. 2009) (evidence that was purportedly seized without a warrant in contravention of local law did not provide grounds for relief under the Fourth Amendment where the defendant did not have a reasonable expectation of privacy in the area searched).  Societal understandings of privacy that underpin Fourth Amendment analysis remain independent of state laws on the subject.  *See Greenwood, supra*.

In sum, defendant's efforts to invoke the Louisiana Constitution as a basis for according him an objective expectation of privacy in Turner's vehicle prove unavailing.

**b)      The Search Warrants Are Supported by Probable Cause**

Even if Honeycutt *had* demonstrated a legitimate expectation of privacy in Turner's car and its contents, the court still finds that exclusion is not warranted.  The exclusionary rule requires the suppression of evidence that is seized pursuant to a warrant unsupported by probable cause.  *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (citation omitted).  "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."  *Gibbs, supra* (citation omitted).  Thus, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith."  *Id*.  If this good faith exception applies, then the inquiry ends. *Gibbs, supra*.  The government bears the burden of demonstrating that the good faith exception applies.  *U.S. v. Gant*, 759 F.2d 484, 487 (5th Cir. 1985).

Pursuant to the good faith exception, a reviewing court is obliged to defer to an issuing judge's probable cause determination in signing a warrant unless:

(1)     the issuing-judge was misled by information in an affidavit that the
affiant knew was false or would have known was false except for
his reckless disregard of the truth;

(2)     the issuing-judge wholly abandoned his judicial role in such a
manner that no reasonably well trained officer should rely on the
warrant;

(3)     the underlying affidavit is "bare bones" (so lacking in indicia of
probable cause as to render official belief in its existence entirely
unreasonable); or

(4)     the warrant is so facially deficient . . . that the executing officers
cannot reasonably presume it to be valid.

*Gibbs, supra* (citations and internal quotation marks omitted).

If the good faith exception does *not* apply, the court must consider whether the warrant was

supported by probable cause.  *Gibbs, supra*.

Here, defendant primarily invokes the first qualifier and argues that the good faith

exception does not apply because MNU agents misleadingly represented in their warrant

applications that Vacarra Rogers had directed Turner to transport "CDS" from Texas to Monroe.

Defendant contends that Rogers never named any illicit substance in the telephone calls and

instead used code words such as "tire."  However, defendant makes no showing that MNU agents

*deliberately lied* or *recklessly disregarded* the truth.  *See United States v. Smith*, 609 Fed. Appx.

180 (5th Cir. 2015).

Even if he had made such a showing,

[a] misstatement can vitiate an affidavit only where the misrepresentations are the
product of deliberate falsehood or of reckless disregard for the truth.  The court
must then consider whether the remaining portion of the affidavit is sufficient to
support a finding of probable cause. After omitting all intentional or reckless
falsehoods, the issue is whether the affidavit contains facts from which the
magistrate could make an informed and independent judgment as to whether
probable cause existed and whether there was a substantial basis for his

determination that probable cause did exist.

*Moreno v. Dretke*, 450 F.3d 158, 169-70 (5th Cir. 2006) (internal citations and quotation marks omitted).

Probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006).  Furthermore, a magistrate needs only a substantial basis for concluding that a search would uncover evidence of wrongdoing.  *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted).

The undersigned finds that after redacting the information challenged by defendant, the remainder of the affidavit provides probable cause to support the initial tracking device warrant. *See United States v. Namer*, 680 F.2d 1088, 1093 (5th Cir. 1982).  Omitting the "CDS, reference, the affidavit stated that a detainee (i.e. someone already in prison on another pending charge) directed a female to take a trip to Texas to retrieve "something" from an individual there.  The detainee further instructed the female on how to avoid law enforcement detection – a statement that confirms the trip's illicit purpose.  The female also is supposed to make the trip in her vehicle, after she leaves work on October 9, 2014.  Finally, the affiant explained that it was common for subjects involved in distribution of CDS to travel to Texas to acquire their product.

The (second) search warrant for Turner's car also was supported by probable cause.  The supporting application included the same background information from the tracking device application, but added that the vehicle had traveled to Dallas, Texas, arrived there on October 10, 2014, at 2:30 a.m., and briefly stopped at two locations before returning to the Monroe area.  *See e.g., Maryland v. Dyson*, 527 U.S. 465, 465-66, 119 S. Ct. 2013, 2013 (1999) (probable cause to stop and search car where deputy had received tip that driver had gone to New York to buy

drugs); *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (officers had probable cause to stop and search car based on intercepted phone calls from which they inferred that defendant intended to buy cocaine from a tire store, despite the fact that he sometimes bought actual tires there).

Defendant highlights various irregularities in the warrant application including the fact that rather than being stopped on I-20 *westbound* in West Monroe, the vehicle actually was stopped in Monroe after exiting I-20 *eastbound*. Moreover, the application indicated that the agent believed that "methamphetamine" may be found, which defendant contends is evidence that the officers already had searched the car at the time they applied for the warrant. These errors, however, likely represent holdovers from a prior version of the application form that the agents used in another case. Technical errors, of course, do not invalidate a warrant. *United States v. Almaguer*, 589 F. App'x 285, 286 87 (5th Cir. 2015) (citation omitted).

These errors in the application and the ambiguous sequencing of the stop and warrant application are not material because the agents did not need a warrant to stop and search the car. The "automobile exception" to the search warrant authorizes the police to search a vehicle if they have probable cause to believe that it contains contraband. *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)). "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may

conceal the object of the search." *Ross*, 456 U.S. at 825.

As the facts in the warrant application(s) readily demonstrate, the officers had probable cause to believe that Turner's vehicle contained contraband, sufficient for them to stop the car and to remove it to headquarters for a safe, thorough search. *United States v. Powell*, 732 F.3d 361, 373 (5th Cir. 2013) *cert. denied*, ___ U.S.___ , 134 S. Ct. 1326 (2014) (probable cause to search the vehicle also authorized movement of the car to a safer location to conduct the search) (citation omitted).[7]

In sum, the court discerns no viable Fourth Amendment-inspired challenge cognizable to defendant as a result of the stop and search of Turner's 2003 Lexus and the subsequent discovery of contraband therein.

## II.    The Home

### a)    The Agents Did Not Violate the Fourth Amendment By Conducting a "Knock and Talk"

Law enforcement officers are not constitutionally obliged to halt a criminal investigation and apply for a search warrant as soon as they obtain requisite evidence to establish probable cause. *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 1860-61 (2011).[8]   Rather, officers,

---

[7]  The court notes that the stopping officer is entitled to rely upon the collective knowledge of all the officers and deputies involved in the investigation of Turner and her vehicle. *United States v. Hernandez*, 477 F.3d 210, 215 n13 (5th Cir. 2007) (citation omitted). "Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citation omitted).

[8]  In contrast to the 2003 Lexus, the undersigned observes that defendant possesses the requisite standing to assert a Fourth Amendment violation for events occurring at 1713 Hollywood Drive.  At minimum, it is uncontested that Honeycutt resided at this address.  *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (a defendant's "status as an overnight guest is

without a warrant, are permitted to "approach a home and knock, precisely because that is no more than any private citizen might do." *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1416 (2013) (citation and internal quotation marks omitted).[9]  Of course, just as when a private citizen knocks on the door, the occupant is under no obligation to open the door or to speak to the officer.  *Kentucky v. King, supra*.  Moreover, "even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."  *Id.*

Here, rather than expending the time and effort to apply for a warrant, S.A. Zordan opted to knock on the front door of the house to see whether he could streamline the process by obtaining the owner/occupant's permission to enter and search the home.  This investigative tactic is not inherently unreasonable.  *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).

### b) Defendant Freely and Voluntarily Permitted the Agents to Enter the Home

Under the Fourth and Fourteenth Amendments a search conducted without a warrant supported by probable cause is presumptively unreasonable, subject to but a few well-delineated exceptions.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973).

_____

alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable").

[9]  One of the recognized reasons that officers may choose this so-called "knock and talk" strategy is so they may seek consent to search from the occupant of the home, thereby obviating the time and inconvenience of applying for a warrant.  *Kentucky v. King, supra*; *but see Johnson v. United States*, 333 U.S. 10, 15, 68 S. Ct. 367, 369 (1948) (inconvenience to the officers and some slight delay to prepare papers and present the evidence to a magistrate never constitutes a convincing reason to bypass a search warrant).

"One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir.2010) (citation omitted).   To meet this exception, the government must prove by a preponderance of the evidence (1) that consent was given, (2) voluntarily, (3) by a party with actual or apparent authority, and (4) that the search was within the scope of the consent. *United States v. Freeman*, 482 F.3d 829 (5th Cir. 2007); *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005).  The first two inquiries are determined based on the totality of the circumstances; whereas the court weighs the latter two considerations under a reasonable officer standard.  *Id*.

Here, the uncontradicted evidence establishes that when Honeycutt answered the front door, he was confronted by five to six officers, with their weapons holstered.  One of the lead agents, S.A. Zordan, asked Honeycutt if he could speak with him, to which Honeycutt replied, "sure," and the agents stepped inside.  Consent need not be express; it may be signaled by the consenting party's actions.  *See Scroggins, supra*.  There is no evidence that the agents barged in or forced their way into home.  There also is no evidence that Honeycutt objected to the entry or that he attempted to limit his willingness to speak to the agents by only agreeing to speak with them outside.  Finally, defendant does not contest that he had authority to permit the agents inside of the home.  The undersigned finds that the officers did not violate defendant's Fourth Amendment rights by entering the house.

c)      **The Fourth and Fifth (via the Fourteenth) Amendments do not Bar the Admission of Defendant's Incriminating Statements at Trial**

The admissibility of pre-indictment confessions is regulated by both the Fifth

Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due

Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause").  The Fifth

Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness

against himself . . ."  U.S. CONST. AMEND. V.  In *Miranda v. Arizona*, the Supreme Court held

that

> the prosecution may not use statements, whether exculpatory or inculpatory,
> stemming from custodial interrogation of [a] defendant unless it demonstrates the
> use of procedural safeguards effective to secure the privilege against
> self-incrimination. By custodial interrogation, we mean questioning initiated by
> law enforcement officers after a person has been taken into custody or otherwise
> deprived of his freedom of action in any significant way. As for the procedural
> safeguards to be employed, unless other fully effective means are devised to
> inform accused persons of their right of silence and to assure a continuous
> opportunity to exercise it, the following measures are required. Prior to any
> questioning, the person must be warned that he has a right to remain silent, that
> any statement he does make may be used as evidence against him, and that he has
> a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted).

The central principle established by *Miranda* is that if the police question an in-custody suspect

without informing him of the rights specified therein, then his responses cannot be introduced

into evidence to establish his guilt.  *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138,

3144 (1984).  "[F]ailure to give the prescribed warnings and obtain a waiver of rights before

custodial questioning generally requires exclusion of any statements obtained.  Conversely,

giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . .

." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

In addition, a criminal defendant is "deprived of due process of law if his conviction is

founded, in whole or in part, upon an involuntary confession, without regard for the truth or

falsity of the confession and even though there is ample evidence aside from the confession to

support the conviction." *Lego v. Twomey*,  404 U.S. 477, 483-484, 92 S.Ct. 619, 623- 624 (1972) (citations and internal quotation marks omitted).  The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*.  The sole purpose of the hearing is to determine whether the confession was coerced.  *Id*.

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver.  *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986); *Lego, supra; United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). The voluntariness of a waiver contemplates two distinct dimensions:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citation omitted). Nevertheless, in *Connelly*, the Supreme Court clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly, supra*.  Equally, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Id*. Thus, the voluntariness of a *Miranda* waiver and resulting confession depend upon the absence of police overreaching, not on "free choice." *Id*.

The Fifth Circuit has remarked that after *Connelly*, the relevant test no longer focuses on the defendant's free will. *United States v. Raymer*,  876 F.2d 383, 386 -387 (5th Cir. 1989) (citations omitted).  "Instead, the focus is on the presence or absence of police coercion." *Id*.

Although a defendant's mental condition still figures into the voluntariness calculus, there must

be an element of official overreaching to render a confession involuntary under the Constitution.

*Id*.  In other words, the police must exploit the defendant's mental condition.  *See Raymer, supra*.

Applying the foregoing considerations here, the undersigned reiterates that there was no

antecedent Fourth Amendment violation.  *See* discussion, *supra*.  Furthermore, it remains

uncontroverted that S.A. Zordan advised Honeycutt of his *Miranda* rights shortly after he

initiated contact, and before he obtained any potentially incriminating statements from him.  The

record is devoid of any allegations or evidence of coercive police tactics throughout the agents'

encounter with Honeycutt.  Moreover, there are no issues regarding Honeycutt's mental

competence or lucidity at the time that he made any incriminating statements.

In the absence of police "overreaching" or coercion and upon consideration of the totality

of the circumstances, the undersigned finds that the government has demonstrated by a

preponderance of the evidence the voluntariness of Honeycutt's incriminating statement(s) and

*Miranda* waiver.

> **d)      Defendant Freely and Voluntarily Led the Agents to the Jar of
> Methamphetamine**

After S.A. Zordan advised Honeycutt of his *Miranda* rights, Honeycutt admitted that

Turner had left methamphetamine at the house.  Honeycutt did not express any objection to S.A.

Zordan's request for permission to secure the contraband.  In fact, Honeycutt walked down the

hall to retrieve it himself.  He also did not object to Zordan's stated intention to accompany

Honeycutt as he proceeded to the bedroom because of Zordan's reasonable (but undisclosed)

concerns for officer safety.  There is no evidence that the agents coerced Honeycutt's admission

or compliance.  Rather, the entire encounter remained light-hearted, with defendant's  full

cooperation.  Accordingly, the court finds that the agents lawfully seized the methamphetamine

pursuant to Honeycutt's admission and his implied consent for them to accompany him.

### e)   Defendant Granted the Agents Permission to Search the Remainder of the Home

The court reiterates that consent to search requires the government to prove:  (1) that

consent was given, (2) voluntarily, (3) by a party with actual or apparent authority, and (4) that

the search was within the scope of the consent.  *Freeman, supra; Santiago, supra*.  The court will

address these elements, in turn.

### I)   Defendant Granted Permission for the Agents to Search the Rest of the House

As soon as the agents secured the jar of methamphetamine, they escorted Honeycutt back

to the living room where they informed him that he was under arrest.  Zordan advised Honeycutt

that the agents needed to search the remainder of the home, and asked him whether he objected.

S.A. Zordan testified that Honeycutt assented to the search.  There is no evidence to the contrary,

and Zordan appeared entirely sincere and credible at the hearing.  Thus, the court accepts his

testimony and finds that Honeycutt consented to the search.

### ii)   Defendant's Consent was Voluntary

Voluntariness of consent is determined by the totality of the circumstances, comprised of

six factors:

(1)     the voluntariness of the defendant's custodial status;

(2)     the presence of coercive police procedures;

(3)     the extent and level of the defendant's cooperation with the police;

20

(4)      the defendant's awareness of his right to refuse to consent;

(5)      the defendant's education and intelligence; and

(6)      the defendant's belief that no incriminating evidence will be found.
*United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993) (citation and internal quotation marks omitted).

Although all six factors are relevant, no single factor is dispositive.  *Id*.

Applying the foregoing considerations here, the court initially finds that at the time of the consent, Honeycutt was under arrest, but not in handcuffs.  Furthermore, he verbally consented to the search in surroundings familiar to him, i.e. in his home, rather than at the police station.  *See United States v. Riley*, 968 F.2d 422, 426-427 (5th Cir. 1992).  Second, although there were at least five agents in his home, no weapons were drawn, and there is no evidence that they threatened, shouted, tricked, or cajoled him into granting consent.  Moreover, Honeycutt was cooperating fully with the police:  he had conceded the presence of contraband in the home and led them to it.  At the hearing, S. A. Zordan confirmed that the mood of the encounter was jovial, and that Honeycutt never complained about the agents' actions.

There is no evidence that Honeycutt was aware of his right to refuse consent.  However, as one of his present charges includes possession of a firearm by a convicted felon, he apparently is not a novice in matters of criminal and police procedure.  *See United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828 (1976) (defendant was not a newcomer to the law).  Moreover, before seeking consent to search, Zordan advised Honeycutt of his *Miranda* rights, which included his right to remain silent.  *Riley, supra* (remarking that the officers had advised defendant of his *Miranda* rights).

No evidence of Honeycutt's education and intelligence was adduced at the hearing.

However, he told Zordan that he understood his *Miranda* rights.  Finally, because of the number of items located in the house that were not well-hidden, Honeycutt likely knew that incriminating evidence would be discovered.

Upon consideration of the totality of the circumstances, the undersigned finds that Honeycutt's consent to search the remainder of the home was voluntary.  *See e.g., United States v. Estrada*,  459 F.3d 627 (5th Cir. 2006) (consent freely given where defendants were calm and cooperative and police did not employ coercive tactics); *United States v. Timoteo*, 353 Fed. Appx. 968, *6 (5th Cir. Dec. 1, 2009) (arrestee's verbal consent to a limited search was voluntary, where he was very cooperative and despite his refusal to sign written consent).

iii)    Defendant had Actual or Apparent Authority to Consent

There is no dispute that Honeycutt had actual or apparent authority to consent to the search of his home.

iv)    The Search Did Not Exceed the Scope of Defendant's Consent

"When the police are relying upon consent . . . they have no more authority than they have apparently been given by the consent."  *United States v. Fields*, 131 Fed. App'x 42, 44 (5th Cir. 2005).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  Courts must "take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope . . ." *Fields*, 131 Fed. App'x at 44.  For example, consent to search may be limited in terms of time, duration, area, or intensity.  *United States v. Green*, 388 Fed. Appx. 375, 382-83 (5th Cir. July 1, 2010) (unpubl.)

(citation omitted).  Nonetheless, the failure to object to a search is "an indication that the search was within the scope of the initial consent."  *See e.g. United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995); *United States v. Mejia*, 953 F.2d 461, 466 (9th Cir. 1991).

Here, Zordan obtained permission from Honeycutt to search the "rest of the house." There is no evidence that Honeycutt limited the scope of his consent, or later retracted it. Moreover, the search itself was extremely brief – two minutes.  Thus, the court readily finds that the scope of Honeycutt's consent extended throughout the house, including the areas where the agents uncovered the seized items.

The court finds that the government lawfully seized the revolver, pistol, drug paraphernalia, and $800 pursuant to defendant's free and voluntary consent.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 49] filed by defendant, Kevin Honeycutt be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS**

**REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 14th day of September 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE